J. C. BLAIR CO., PETITIONER, *v.* COMMISSIONER. OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7147. Promulgated April 18, 1928.

*W. W. Spalding, Esq.*, and *H. A. Fellows, Esq.*, for the petitioner.
*D. D. Shepard, Esq.*, for the respondent.

## OPINION.

TRAMMELL: The original petition filed in this case includes the calendar year 1919, and purports to seek a redetermination of the petitioner's tax liability because of errors alleged for that year, as well as the years 1918 and 1920. The deficiency letter attached to the petition discloses that the respondent determined an overassessment for 1919, not arising from the denial of any claim for the abatement of a deficiency. Hence, we have no jurisdiction to redetermine the tax liability for 1919, and the appeal as to that year is dismissed. *Cornelius Cotton Mills*, 4 B. T. A. 255. However, in redetermining the deficiencies for 1918 and 1920, we will determine and consider such facts with relation to the tax liability for 1919 as may be necessary correctly to redetermine such deficiencies. Sec. 274 (g), Revenue Act of 1926.

We will consider first the contention of the petitioner that the respondent erred in reducing invested capital for 1918 and 1919 by

certain amounts representing dividends paid from surplus. This contention is based on the fact that, in computing said amounts, the respondent first deducted from the current earnings available for the payment of dividends, the amount of a tentative tax accrued for each of said years. The respondent concedes that his action in this respect comes within the principle of our decision in *L. S. Ayers & Co.*, 1 B. T. A. 1135. Accordingly, on this point we must hold that the petitioner's invested capital for said years may not be reduced to the extent that the amount of the dividends paid from surplus is affected by the deduction of the tentative taxes. See also *McGowin-Foshee Lumber Co.*, 10 B. T. A. 961.

The next and principal issue presented involves the question whether the respondent erred in refusing to include in the computation of invested capital for the years 1918, 1919 and 1920, the amount of $156,511.91, alleged by the petitioner to represent that part of the cost of its design plant erroneously charged to expense during the years from 1891 to 1921.

From 1891 to 1917, inclusive, the petitioner capitalized, by charging to its general plant account, the total sum of $101,093.39 for items entering into its so-called design plant. The depreciated balance of the plant account, which included the depreciated balance of the items comprising the book cost of the design plant, was included in the petitioner's invested capital and is not involved in the controversy here.

The petitioner's design plant was not a segregated unit, but this term was used to designate an integral part of its general plant or printing department. Nor did the petitioner maintain a separate account on its books to show cost of the design plant. The total sum above referred to represents the aggregate expenditures made by the petitioner during the years stated for outside purchases of electrotypes, and other material entering into the design plant, which were recorded in its plant account.

The electrotypes purchased by the petitioner were in the form of rough castings, and it was necessary to underlay and build them up so that they could be used in printing tablet covers. It was also necessary to record and file the electrotypes and other cuts so they would be available for use when needed. This work was performed by the employees of the petitioner. Apparently, no employee devoted his whole time to this work, but only such part of his time as was required. It further appears that the officers and certain employees of the petitioner were engaged for a part of their time in connection with other matters pertaining to the design plant.

The total sum capitalized as cost of the design plant, above mentioned, did not include any element of overhead expenses, or for

salary or wages. All items of salary and wages, as well as general overhead, were concurrently charged to expense. The petitioner now seeks to capitalize, and to include in the computation of its invested capital for the years in question, the additional aggregate amount of $156,511.91, which, it contends, represents that part of its general overhead expense and expenditures for salaries and wages, properly allocable to cost of the design plant, and which it alleges was erroneously charged to expense.

The respondent refused to include said amount in the computation of invested capital on the ground, first, that the charging to expense of said items, was as a matter of good accounting, to a large extent optional, and that in charging said items to expense and deducting such expense from income, the petitioner exercised a binding option; and, second, on the ground that the retrospective appraisal offered to substantiate the amount claimed depended in a large measure upon estimates as to both basic and overhead figures. For substantially the same reasons, the respondent here urges that the petitioner should not be permitted to include any part of said amount in its invested capital.

The fact that expenditures made in the development or creation of capital assets were concurrently charged to expense and deducted from income does not bar their restoration to capital, if the amounts of the expenditures and the fact that they were capital expenditures are established by satisfactory evidence. And the fact that such expenditures were erroneously charged to expenses and deducted from income does not constitute the exercise of a binding option, which will prevent their restoration to capital. *Goodell-Pratt Co.*, 3 B. T. A. 30. To the same effect, and for further discussion of the principles involved, see also *Union Metal Manufacturing Co.*, 1 B. T. A. 395, and *Gilliam Manufacturing Co.*, 1 B. T. A. 967.

Therefore, to decide this issue as presented here, it remains only to determine whether the petitioner has fairly established the amount of the expenditures which it claims were erroneously charged to expense and should now be capitalized, and whether such amounts in fact represent capital expenditures.

The evidence offered by petitioner in support of its contention consists substantially, if not wholly, of the retrospective ascertainment of cost, which is referred to for convenience as the retrospective appraisal, together with testimony concerning the methods by which the appraisal report was prepared. The details of those methods are set forth at some length in our findings of fact.

The appraisal was made during 1922, and the appraisal report was completed in May, 1923. A statement was prepared from the books showing the total amounts of salaries and wages paid to the

officers of the petitioner and certain employees from 1891 to 1896, from 1896 to 1903, and for each year thereafter up to and including the year 1921. The president of the petitioner in consultation with other officers and the appraiser then determined the amount of the total salaries and wages paid for each period or year, which, in their opinion, was properly allocable to the cost of the design plant. To such portions of the salary expenditures amounts were then added varying from 40 per cent to 75 per cent thereof, as representing what was considered to be proper allocations of general overhead expenses.

It thus appears that the amount of the expenditures, which the petitioner now contends should be capitalized, was retrospectively determined in 1922, for a period extending more than 30 years into the past. The percentages of overhead allocated to cost were not matters of record in the petitioner's books, and the evidence does not disclose that those who participated in making the allocations, both of salaries and overhead, had personal knowledge of the facts essential to the making of substantially accurate allocations. The president was the only witness who had been with the company during the prior years.

This officer was an employee of the petitioner in 1891, and has continued his connection with the corporation down to the present time. He became president in 1919, but during the early years subsequent to 1891, the evidence does not disclose that he exercised any supervision over the design plant or performed any functions pertaining thereto. It is not shown that his personal knowledge was more than casual with respect to the amount of time devoted by the various officers and employees of the petitioner during those years in creating or building up the design plant, nor that he otherwise possessed accurate information as a basis for the allocations made.

In *Milwaukee Brass Manufacturing Co.*, 10 B. T. A. 936, we held that amounts expended in prior years for materials and labor in the manufacture of tools, dies, etc., charged to expense, should be restored to capital account for the purpose of computing invested capital, but the evidence in that case satisfactorily established the cost of material and labor used, and enabled us to find with reasonable accuracy the amounts of the respective expenditures. However, no element of overhead expenses was included, and in considering that question, we said:

> In arriving at the cost of such replacements we have not included the charges for overhead which petitioner claims is properly to be attributed thereto. * * * At best, the allocation of overhead expenses between various operations is unsatisfactory, and where it appears that the consistent practice has been to charge off such expenses as incurred we are not inclined to change the accounts in order to capitalize them.

Again, in *Coatesville Boiler Works*, 9 B. T. A. 1242, we declined to include in invested capital an estimated portion of the salary paid to the corporation's president, previously charged to expense, which, it was contended, was properly allocable to the cost of capital assets.

Without considering generally the difficulties encountered in attempting to allocate overhead to the cost of capital assets, it is sufficient here to say that the evidence adduced by the petitioner in support of its contention is, in our opinion, too indefinite, uncertain, and speculative to form a basis for including in its invested capital any part of the additional amount claimed. The determination of the respondent on this point is, therefore, approved.

With respect to the third issue, the petitioner contends that the fair market value of its design plant at March 1, 1913, was $300,000, and that the respondent erred in refusing to allow a deduction for depreciation based on this valuation, plus the cost of subsequent additions thereto.

The president of the petitioner testified that the conservative fair market value of the design plant at March 1, 1913, was about $300,000. He further testified with respect to this matter as follows:

Q. Have you ever sold any so-called design plants?
A. No.
Q. Do you know of any sales of design plants?
A. I do not know of any of design plants, but that is one part of the industry that is very valuable.

\* \* \* \* \* \* \*

Q. So that is the reproductive cost that you are referring to as of March 1, 1913?
A. That would be a fair price for the reproduction, yes.
Q. You mean it would cost $300,000 to reproduce these assets in the so-called design plant?
A. I think it would.
Q. Is that less depletion?
A. I cannot answer that question. I am not in the bookkeeping end of it.

\* \* \* \* \* \* \*

Q. Is your opinion based in any degree upon an appraisal?
A. It is based on those figures that I have gone over at the time of the appraisal.

\* \* \* \* \* \* \*

Q. Then you must admit that all your testimony as heretofore stated, that this so called value of $300,000 is a mere estimate of the cost of reproduction?
A. I think it would be a very low estimate.
Q. It is an estimate?
A. It is an estimate.

Jackson, who prepared the retrospective appraisal report, testified that the depreciated reproductive value of the design plant as of March 1, 1913, was $206,492.42. This amount was arrived at by

applying to the reproductive costs of each year to March 1, 1913, retrospectively determined, a theoretical depreciation rate of 5 per cent per year. This witness further testified that he believed the fair market value at the basic date to be not less than the depreciated reproductive value.

McSheehy, the only remaining witness who testified as to the March 1, 1913, value, stated that in his opinion the petitioner's design plant had a fair market value at that date of not less than $350,000.

These three witnesses were closely associated in the work of preparing the retrospective appraisal or cost determination and their testimony does not, in our opinion, furnish a satisfactory basis for the determination of the fair market value of the property in question. The market value of property at a given date is a fact, which often has no direct relation to depreciated cost. The witnesses mentioned did not convince us of their knowledge of market values. However, without further reference to the qualifications of these witnesses to express opinions on the fair market value of the petitioner's design plant, we can not escape the conclusion, upon consideration of all the evidence before us, that their opinions were largely if not solely based upon the so-called retrospective appraisal or determination of cost which they, each, had helped to make.

In many prior cases, we have refused to accept retrospective appraisals as a satisfactory basis for determining market value. *Rockford Malleable Iron Works*, 2 B. T. A. 817; *Tibby-Brawner Glass Co.*, 2 B. T. A. 918; *Hart Cotton Mills*, 2 B. T. A. 973.

While under some circumstances a retrospective determination of cost or appraisal may be considered some evidence of market value, the particular appraisal or cost determination here was based on such indefinite and uncertain facts, depending to such a large extent for its accuracy on the memory of a single witness as far back as 30 years in the past, and, it not being shown that the witness was in a position in the past years to ascertain or learn the facts with any degree of accuracy, in our opinion it is of little or no value as a basis for determining fair market value of assets. We did not accept it as a determination of cost, and there is no more reason why it should be used as the basis of market value.

Upon consideration of all the evidence in the record, we are unable to say that it is sufficient to justify the substitution of any other or different basis for invested capital and depreciation purposes with respect to the assets in question than that used by the respondent. Accordingly, the respondent's determination is approved.

*Judgment will be entered on 15 days' notice, under Rule 50.*